### CITY OF LAMPASAS v. TALCOTT.

(Circuit Court of Appeals, Fifth Circuit. May 9, 1899.)

No. 757.

MUNICIPAL CORPORATIONS—DE FACTO OFFICERS—VALIDITY OF BONDS.

The city of Lampasas was incorporated April 18, 1873, under a special charter, authorizing its mayor and and aldermen, among other things, to construct waterworks and issue bonds for public improvements. Its organization was perfected, and continued until 1876, when its officers resigned, and administration of its affairs was abandoned. In 1883 an effort was made to form a new municipality, including within its limits the territory of the original city and a large amount of contiguous territory. Officers were elected, and the new government was organized, and continued to perform the functions of a municipal corporation until 1890, when quo warranto proceedings were instituted, and the officers removed, on the ground that the special act of 1873 was still in force, and that the resignation of its officers and its failure to continue the administration of its affairs did not amount to a dissolution of the corporation. Thereafter an election was held under the charter of 1873, and its government reorganized, and nearly all of the additional territory attempted to be included in the new city was subsequently annexed. In 1885, while the illegal organization was in force, it issued bonds for the purpose of constructing waterworks. The waterworks were constructed and accepted by the city. Upon the dissolution of this organization, the waterworks passed into the possession of one holding a claim for services as superintendent, and the city ceased to exercise control over the same, and paid to the person in possession monthly rates for the use of the water. *Held*, that the officers acting under the irregular organization were de facto officers of the city, and the bonds issued by them were valid.

In Error to the Circuit Court of the United States for the Western District of Texas.

This suit was brought to recover the sum of $2,170, with interest, alleged to be due on 62 coupons attached to bonds issued by the city of Lampasas. A jury trial was waived by the parties, and at the request of counsel for both parties the court made a finding of the facts. The court held that the plaintiff was entitled to recover on the coupons, and rendered a judgment in his favor for $2,479.86. The defendant, the city of Lampasas, sued out a writ of error. It is assigned as error that the court rendered a judgment against the city. The following are the facts as found by the court:

(1) That the citizens of the city of Lampasas, in Lampasas county, Tex., were by special act of the legislature, approved April 18, 1873, granted a charter as a municipal corporation, under the name of the "Corporation of the City of Lampasas," with boundaries containing an area of 553 acres, covering the original town plat and a considerable area not laid out in regular blocks. In this special charter it was provided that the qualified voters should elect a mayor and board of aldermen, consisting of eight members, to hold office for the term of two years, and until their successors should be elected and qualified, and it was further provided that the mayor and five aldermen should constitute a quorum for the transaction of business. It was also provided that the first election should be held within 30 days, and one thereafter on the first Monday in January of each alternate year thereafter, by the mayor and three aldermen. The act made no provision for dissolving the corporation, and no period of time was fixed for the expiration of the charter.

(2) Under this special charter the said mayor and aldermen were granted power, by ordinance, among other things, to construct waterworks, open, grade, and keep in repair the streets, build bridges, and open sewers; to impose and collect taxes, not exceeding 1 per cent. per annum; and to issue bonds for public improvements. The mayor and aldermen were authorized to appoint a city marshal, who should also be ex officio assessor and collector of city taxes, and also to appoint a secretary and city attorney; but neither the office of treasurer nor any other officer than those named were provided for.

(3) That officers were elected, and the said municipal government was exercised by them, under the said special charter, from 1873 until 1876, when a mayor and board of aldermen were elected who favored abolishing the said municipal government, and they by formal resolution decided to resign, and did so, and abandoned their said offices, and thereafter no steps were taken, or action of any kind had, under this special charter, until March, 1890, after the decision of the supreme court of Texas in the case of Largen v. State, reported in 76 Tex. 323, 13 S. W. 161, hereinafter more fully referred to.

(4) That the said city of Lampasas was in 1873, and has since continued to be, the county seat of Lampasas county, and had a population in 1876 of about 800. That until the year 1882 the said town was without railroad facilities, when, upon advent of a railroad, it began to grow rapidly, and by April, 1883, had a population of about 4,500 people, with street railroad and other improvements. About 1884 the population began to decline, and continued to decline until about 1890.

(5) That at all times the business part of the town has been chiefly confined to the court-house square and streets leading out from it, and has been within the bounds of the said special charter; but during and since 1882 business houses were built near the railroad depot, outside of said bounds, and outside of the present limits, but inside of the boundaries of 1883, and business has been since transacted therein.

(6) That after the advent of the railroad numerous additions were laid out to the town, and residences built thereon by persons doing business in the town, and it continued to grow in population, until it reached about 5,000 in 1884 and 1885, when the decline in population began.

(7) That in February, 1883, a petition was presented to the county judge of said Lampasas county, by more than 50 qualified voters living in and around the limits of said town, asking that an election be ordered to determine wheth-

er the persons living within the limits in said petition set out should incorporate as a city of more than 1,000 inhabitants, under the provisions of the general laws of Texas, as contained in title 17 of the Revised Statutes. Upon this petition the said county judge made his order, and an election was held, resulting in a majority vote in favor of said corporation,—some of those voting living inside, and some outside, of the limits prescribed by said charter; and upon return thereof the said county judge, by proper order, declared the said city duly incorporated, with the limits in said petition set out, and which contained an area of 1,495 acres, embracing practically all of the lands included within the said special charter, and extending nearly one-half mile west, north, and east thereof, to include the railroad depot.

(8) That, in pursuance to this incorporation, a municipal government was organized, with all the officers prescribed in the general charter contained in said title 17 (some of the aldermen and other officers residing outside of the limits prescribed by said special act), and exercised all the powers and functions of a city of over 1,000 inhabitants, organized under the general laws of the state of Texas, levying and collecting taxes, and prescribing and enforcing police regulations, without any one contesting or disputing the validity of its lawful rights to act as such, until November 4, 1889, when, upon the relation of a citizen and taxpayer, the district attorney, himself also a resident taxpayer, filed an information in the nature of quo warranto against T. J. Largen, who was mayor, and all other persons assuming to act as city officers under this incorporation by vote of the people, alleging that the said incorporation by vote of the people in 1883 was invalid, because of the fact that the said special charter granted in 1873 had never been repealed, and that the action of the officers in resigning in 1876 was without effect, and praying that the said Largen and his associates be ousted from office, and the said incorporation of 1883 be declared invalid.

(9) That said suit was instituted by the said district attorney, without any direction by the attorney general or other executive officer of the state, and without making any of the creditors of said incorporation parties, and upon trial resulted in a judgment ousting the said Largen and associates from office, which judgment, on appeal, was affirmed by the supreme court of Texas on the 31st day of January, 1890, and its opinion may be found in 76 Tex. 323, 3 S. W. 161.

(10) That after the decision of the supreme court affirming said judgment of ouster, the said Largen and associates ceased to act, and upon an order for the election of mayor and aldermen under the special charter of 1873, made by the county judge of Lampasas county, an election was held by persons living within the limits of said charter on the 18th day of March, 1890, and the persons elected as mayor and aldermen met and organized March 19, 1890, and on March 22, 1890, by unanimous vote of the city council it was resolved to accept the provisions of "title 17 of the Revised Statutes of the state of Texas in lieu of the charter granted by the legislature," and a copy of this resolution was duly certified and recorded as required by law, and said city at once assumed to act under the general charter provided in said title 17, and is now acting thereunder.

(11) That on December 26, 1890, by vote of a majority of the resident citizens of the added territory hereinafter mentioned, there was added to the limits of the city, as set out in the special charter of 1873, all of the land west of the same which was included within the limits of 1883, and one tier of blocks additional, since which time the said city government has assumed jurisdiction over said added territory, but has not assumed any jurisdiction over that part lying north and east of said original limits, and which was included within the limits of 1883.

(12) The area of the territory added in December, 1890, was 428 acres, which embraced the greater part of the residence property of the city outside of its original charter limits of 1873.

(13) That the said territory lying north and east of said original limits, and which was within the limits of the charter of 1883, as adopted by the vote of the people, has situated thereon 77 residence houses, occupied by persons 90 per cent. of whom follow some kind of business within the town, as defined by charter limits of 1873. The following map, introduced in evidence, shows

the boundaries prescribed by the act of 1873, the boundaries defined in the order of the county judge in 1883, the boundaries of the territory added in December, 1890, the territory subdivided into lots, blocks, etc.:

Territory subdivided into Lots and Blocks, marked.

Boundaries prescribed by Act of 1873, marked ━━━━━━━━553 acres.

Boundaries prescribed by order of County Judge in 1883, marked ━·━·━·━
1495 acres.

Boundaries of territory added in December 1890, marked ━━━━428 acres.

(14) It was proven that all the books and papers of the city government of the city of Lampasas under the charter of 1873 and 1883 were lost, and could not be found, except the assessment rolls for the year 1889, from which it appears that the assessed value of all lands within the city limits of 1889 was $664,429, and that the personal property was about $400,000, and that the said assessment was divided as follows as to the lands, no division being shown as to personal property, viz.: Within old limits of 1873, $452,444.00; within the part added in December, 1890, $157,915; within the parts north and east, $68,970.

(15) The witness who made the foregoing examination states that the said rolls show the names of 438 voters, divided as follows, viz.: Residing within old limits of 1873 were 175; residing on part added in December, 1890, 167; residing on parts north and east, 96.

(16) From the facts recited in the last two findings, the court finds that the city of Lampasas as now organized, and as it has existed since 1890, embraces about 90 per cent. in value of all real property situated within the city as organized under the charter adopted by vote of the people, and situated therein when the city government under Largen was dissolved, 66 per cent. being in original limits, 24 per cent. in territory added in 1890, and 10 per cent. in territory now excluded, and that of the number of resident voters therein at the time about 22 per cent. are shown to have resided outside the present limits, and of these 90 per cent. are shown to have followed some line of business in said original charter limits of 1873, which is shown to contain all the business part of the city except that near the depot; and from these facts the court finds that the present charter limits embrace substantially all of the persons and property embraced within the limits of the said city of Lampasas as it existed

under the charter adopted in 1883 by vote of the people, and recognized and acted upon by them as a valid city government from the time of its adoption until the quo warranto proceedings against Largen and associate officers in 1889, during which time the officers assuming to act as officers under said general charter were elected in good faith by all persons residing within the said limits of the charter of 1883, and as such officers in good faith discharged the duties of their respective offices, without dispute by any person residing within the restricted limits of the charter of 1873, or by persons living outside of the same.

(17) The court further finds that in January, 1885, the city council of said city of Lampasas, elected under the provisions of the general charter contained in title 17 aforesaid, and assuming to act thereunder, and not under the provisions of the charter of 1873, in good faith, and in response to a general demand of the business men of the city for fire protection, and to furnish water to the city, then having a population of about 4,500, determined to build a system of waterworks for the city, and to pay for the same with the proceeds of sale of bonds of the city, and to this end, after full and open discussion, did pass ordinances to the following effect, viz.:

"Ordinance No. 59 [Printed on Back of Bond].

"An ordinance to be entitled 'An ordinance to provide for the issuance of waterworks bonds of the city of Lampasas and to provide for the payment of the interest and sinking fund of said bonds.'

"Section 1. Be it ordained by the city council of the city of Lampasas, that the mayor of said city be, and he is hereby, authorized and required to have engraved or printed coupon bonds of the city of Lampasas, with semi-annual interest coupons attached, falling due on the first days of January and July of each and every year from and after their date at the rate of 7 per cent. per annum interest; said bonds to be styled 'Lampasas City Waterworks Bonds.'

"Sec. 2. Said bonds shall be drawn to mature at fifty years from date of issuance, with the option reserved to the city council to redeem and retire ten thousand dollars of the principal of said bonds at the end of ten years from the date of the issuance of said bonds, and to redeem and retire five thousand dollars of the principal of said bonds at the end of each period of five years from and after said ten years from date of issuance.

"Sec. 3. Said bonds shall be issued to the amount of forty thousand dollars ($40,000), or so much thereof as may be necessary, shall be dated at the time of issuance, and shall bear interest from said date of issuance.

"Sec. 4. Said bonds shall, at the time of their issuance, be dated and signed by the mayor, countersigned by the city secretary, and registered by the city treasurer.

"Sec. 5. The city secretary and city treasurer shall each keep a record of the number, date of issuance, and amount of said bonds, and the number, amount, and date of maturity of the coupons thereto attached, and shall indorse the countersigning and registration thereof on each of said bonds.

"Sec. 6. Said bonds shall be issued in sums of one thousand dollars each, payable to bearer, and the principal and interest thereon shall be payable at S. M. Swenson & Sons' Bank, New York City, or at the office of the city treasurer in Lampasas, the interest being payable semiannually on the coupons attached.

"Sec. 7. For the purpose of providing for the payment of the interest on said bonds, and to provide a sinking fund for the redemption of the same, a special ad valorem tax of twenty-five cents on every one hundred dollars' worth of property is hereby levied and ordered to be assessed and collected for the year 1885, and for each and every year thereafter until said bonds, principal and interest, are paid, on all property subject to taxation within the city of Lampasas, and rendered to and assessed by the city assessor and collector: provided, however, that the city council shall, from time to time, make a proportionate reduction in the amount or rate of the tax hereby levied whenever the whole amount of said tax shall not be necessary to meet the interest and sinking fund on the bonds of this issue then outstanding.

"Sec. 8. To provide funds for the payment of said interest and sinking fund, there is hereby appropriated out of the revenues of the city, arising from the

net earnings of the waterworks, a sufficient sum annually, beginning with the year 1885, to make up the deficiency (if any there be) of said interest and sinking fund after the collection of the special tax herein provided for, and the sums arising from the net earnings of the waterworks shall not be drawn upon or disbursed for any other purpose until said interest and sinking fund is fully provided for in each year, and the city treasurer shall keep a separate account of all moneys derived from said tax and net earnings of waterworks, to be known and designated on his books and reports as the 'Waterworks Fund.'

"Sec. 9. At the end of ten years from the date of issuance of said bonds, or as soon thereafter as practicable, the city council may designate by an order entered of record on the minutes the numbers and amount of the principal (not exceeding $10,000.00) and date of payment of such bonds of this issue as the city desires to redeem, said numbers being designated by lot or otherwise, as the council may then determine, provided the numbers designated are consecutive, and a copy of such order shall be published in some newspaper in the city of Lampasas, and such other notice, personally or otherwise, may be given to the holder of such designated bonds, their agents or representatives, as the council may determine at the time of such designation, and such designated bonds shall be paid upon presentation, and shall cease to bear interest from and after the date of payment fixed by said order; and at the end of each period of five years thereafter five thousand dollars ($5,000.00) of the principal of said bonds may be redeemed in like manner.

"Sec. 10. The bonds herein provided for shall be sold at not less than par, and in such manner as is or may be hereafter provided by ordinance, resolution, or otherwise, and the proceeds of said bonds shall be devoted exclusively to the construction of a suitable system of waterworks for fire protection, family supply, and other public and private purposes, and for the purpose of such fire department supplies as may be deemed necessary by the council; said system of waterworks to be operated in such manner as may be hereafter provided by ordinance, resolution, or otherwise.

"Filed January 6th, 1885.	S. S. Potts, Secretary.
"Passed January 6th, 1885.	S. S. Potts, Secretary.
"I approve the above ordinance, January 6th, 1885.
　　　　　　　　　　　　"W. J. Standefer, Mayor of City of Lampasas.
　"Attest:　S. S. Potts, Secretary."

　　　　　　　"Ordinance No. 60 [Printed on Back of Bond].

"An ordinance entitled 'An ordinance to provide for the collection of a special tax for the payment of interest and to provide a sinking fund for the redemption of waterworks bonds of the city of Lampasas.'

"Section 1. Be it ordained by the city council of the city of Lampasas, that the city assessor and collector be, and he is hereby, required to assess and collect a special tax of twenty-five cents on the one hundred dollars' worth of all property, subject to taxation within the city of Lampasas, rendered to and assessed by him for the year 1885, and for each and every year thereafter, for the payment of the semiannual interest, and to provide a sinking fund for the redemption of the waterworks bonds of the city of Lampasas, until said bonds, principal and interest, are paid: provided, however, that the city council shall from time to time make a proportionate reduction in the amount of the tax hereby levied whenever the whole amount of tax shall not be necessary to meet the interest and sinking fund on the bonds then outstanding.

"Filed January 6th, 1885.	S. S. Potts, Secretary.
"Passed January 6th, 1885.	S. S. Potts, Secretary.
"I approve the above ordinance, January 6th, 1885.
　　　　　　　　　　　　"W. J. Standefer, Mayor of City of Lampasas.
　"Attest:　S. S. Potts, Secretary."

　　　　　　　"Ordinance No. 65 [Printed on Back of Bond].

"An ordinance to be entitled 'An ordinance to amend section 9 of Ordinance No. 59, passed and approved January 6th, 1885.'

"Section 1. Be it ordained by the city council of the city of Lampasas that section 9 of Ordinance No. 59, passed and approved January 6th, 1885, be so amended so as to read hereafter as follows:

" 'Sec. 9. At the end of ten years from the date of issuance of said bonds, or as soon thereafter as practicable, the city council may designate, by an order entered of record of the minutes, the numbers and amount of the principal, not exceeding $10,000.00, and date of payment of such bonds of this issue as the city desires to redeem; said numbers so designated shall be consecutive, beginning at No. 1, and a copy of such order shall be published in some newspaper in the city of Lampasas, and such other notice, personally or otherwise, may be given to the holder of such designated bonds, their agents or representatives, as the council may determine at the time of such designation, and such designated bonds shall be paid upon presentation and shall cease to bear interest from and after date of payment fixed by said order; and at the end of each period of five years thereafter five thousand ($5,000.00) of the principal of said bonds may be redeemed in like manner.'

"Sec. 2. That this ordinance take effect and be in force from and after its passage.

"Passed March 21st, 1885. Approved March 21st, 1885.

"W. J. Standefer, Mayor.

"Attest: S. S. Potts, Secretary."

(18) As bearing on the question of the validity of said ordinances as the act of de facto officers under the charter of 1873, it is here stated that under said charter of 1873 it is provided:

"Sec. 12. All ordinances and resolutions enacted by said corporation shall be published by posting notice at three public places in the limits of the corporation or by publication for at least three successive weeks in a newspaper published within the limits of said city."

And it was further shown that the city council that passed said ordinances was composed of the mayor and five aldermen, all of whom were elected by general vote of the entire corporation within the limits of the charter under the incorporation of 1883, and that two of the said aldermen and the city secretary resided in the territory outside of the charter limits of 1873, and one of said two aldermen resided in territory northeast of said limits and outside of the present city limits.

(19) After the adoption of the ordinances aforesaid, the said city council advertised for bids for the construction of a system of waterworks, and personally inspected similar works in neighboring towns, and also tried to negotiate a sale of bonds for cash. Failing to effect a sale of the bonds by the time set for receiving the bids, the letting of the contract was postponed. At this time several bidders were ready to submit plans and bids, but, as all contemplated being paid in cash, no bids were made or received. It is shown that there were present at this time, prepared to submit a bid, a responsible party willing to build a system of waterworks for $25,000 in cash; but it was not shown what kind of a system this party intended building, as to the size of mains, pumps, standpipe, or other details, to enable the court to draw any comparison as to whether this bidder proposed to build as good a system as was subsequently built, or not,—the fact being that this bidder demanded cash payment, and was unwilling to take bonds in payment.

(20) At a later date the said city council awarded the contract to a bidder who was willing to build a system according to his plans at the price of $40,000, to be paid in bonds of the said city, and this contractor proceeded to build the said system, and the same was fully tested by the city council before acceptance, and upon such test and approval the said works were accepted and paid for by the delivery by the city council of the bonds as called for in the contract. The city officers paid for the waterworks in bonds, because they had been unable to sell the bonds for money. The bonds were not considered good for their face value. If they had been so considered, the waterworks could have been constructed for less.

(21) It was shown, over the objection of plaintiff as to the competency of the witnesses, by two persons who became familiar with the nature and extent of the said system as built, one about one year and the other about two years after it was constructed, that in their judgment the said system was worth, at cash values, based upon cost of construction, according to the estimate of one, the sum of $25,000, and of the other $26,279; neither witness al-

lowing anything by way of profits to the contractor. This was all the testimony on this point. Neither of these witnesses were shown to have been familiar with the price of material and labor in 1885, nor to have had any knowledge of building waterworks at that time; but one of them operated the works from 1885 to 1891, and the other had been engaged since 1887 in putting in waterworks under contract in various cities in Texas.

(22) The plaintiff introduced and read in evidence, for the purpose of identification, and to prove the ordinances indorsed thereon and hereinbefore set out, one of the bonds alleged to have been issued by defendant in payment for the said system of waterworks, which bond is in words and figures as follows:

"State of Texas.

"Lampasas City Waterworks Bond.

"The City of Lampasas

"Will pay one thousand dollars to bearer, fifty years after date hereof, with interest from date at the rate of seven per cent. per annum, payable semi-annually, on the first days of January and July, in each year, payable at the office of S. M. Swenson & Son in the city of New York, or at the treasurer's office in the city of Lampasas, on presentation of the proper coupon hereto attached. Issued under authority of an ordinance entitled 'An ordinance to provide for the issuance of waterworks bonds of the city of Lampasas, and to provide for the payment of the interest and sinking fund of said bonds,' passed January 6th, 1885, a copy of which ordinance is printed on the reverse side hereof, to which reference is made.

"Witness the hand of the mayor of the city of Lampasas, attested by the city secretary, with the corporate seal affixed, in the city of Lampasas, state of Texas, this twenty-seventh day of March, A. D. 1885.

"W. J. Standefer, Mayor.

"Attest:  [Seal.]  S. S. Potts, Secretary."

Attached to the said bond were coupons Nos. 24 to 100, inclusive. In the upper left-hand corner, in transverse form, and separated from the body of the bond by vignette line, was the following:

"————————, Comptroller State of Texas.

"S. S. Potts, Secretary City of Lampasas.

"W. S. Morris, Treasurer City of Lampasas."

On the back of said bond was the following indorsement: "Registered March 28, 1885. Wm. J. Swain, Comptroller." But no seal was affixed to such signature or indorsement. On the back of this bond was printed copies of the ordinances under which it was issued, as hereinbefore set out.

(23) The plaintiff introduced in evidence a certificate from the comptroller of public accounts of the state of Texas, made after the institution of this suit, certifying that the records of his office showed that on March 28, 1885, there were duly registered 40 bonds of the city of Lampasas, of the denomination of $1,000 each, known as "Waterworks Bonds." And the plaintiff further introduced in evidence a certified copy of a statement submitted by W. J. Standefer, mayor, and S. S. Potts, secretary, of the city of Lampasas, to the comptroller, when said bonds were tendered for registration, certifying that the assessed value of all property situated within the limits of said city of Lampasas, as shown by the tax rolls for the year 1884, was $1,447,200.

(24) The plaintiff read in evidence 62 coupons, described in his petition, each of the sum of $35, and maturing at the different dates set out in his petition, which said coupons, except as to due date and number of bond, were of the following form:

"$35.                    The City of Lampasas                    $35.

"Will pay the bearer thirty-five dollars at the office of S. M. Swenson & Son in the city of New York, or at the treasurer's office in the city of Lampasas, on the 1st day of ————, 189—, being six months' interest on bond No. ——.

"S. S. Potts, Secretary."

Upon which coupon the court finds that there is due the plaintiff on this day the sum of $2,170 principal and $309.86 interest.

(25) At the time of the affirmance of the judgment in Largen v. State, 76 Tex. 323, 13 S. W. 161, one H. E. Hedeman was in charge of the waterworks so acquired for said bonds, he having taken charge of said waterworks as superintendent before the dissolution of said organization of 1883. He held possession of said waterworks under a claim for $150, back salary due him from the dissolved organization, and for some other moneys due him for a house placed on the waterworks grounds. Asserting such claim, he remained in charge of such waterworks for over one year from the dissolution of said corporation of 1883. He delivered possession of said waterworks to Coler & Bro., bankers and brokers of New York City, through their agent, W. L. Vining, for the reason that Coler & Bro. paid him the debt due him and for his interest in said house,—said Vining at the time exhibiting to him one of said bonds of said series, and stating that said Coler & Bro. owned it and all other bonds of said series; and said Coler & Bro. and their assigns have from that time controlled and claimed to own said waterworks, and still control and claim to own said system of waterworks. It was not shown that the bond exhibited to said Hedeman by Vining was one of the number from which any of the coupons in suit was taken, nor was any further proof made that Coler & Bro. owned any of said bonds, or represented any of the owners thereof. It was shown that the said Hedeman did not pretend to act for the city of Lampasas in making a settlement of said bond, and only assumed to act in the protection of his own individual claim.

(26) The court further finds that, since the reorganization of the city government in 1890, under the special charter of 1873 and the general charter adopted immediately thereafter, the city of Lampasas has exercised no control over said waterworks, but has paid, monthly, first to said Hedeman and then to Coler & Bro., for the use of water supplied by said waterworks system, and that since said reorganization in 1890 said city of Lampasas has not taken possession of any other property within its limits that was acquired or constructed between 1883 and 1890, except one bridge, built prior to 1890, which was not paid for, but which, on account of such nonpayment, was taken possession of by the builders, and sold by them to the county of Lampasas and the city as organized in 1890.

(27) It was shown that the pumping station of the waterworks as originally constructed was situated within the corporate limits as defined in the charter of 1883, but was removed by the city in 1887 to a point without the corporate limits of 1883, and has remained at said place ever since. It was further shown that the standpipe was located at a point near the west line of the charter limits of 1883, but within such limits, and that the distributing water mains leading from said standpipe were distributed through the part of the city west of the original charter limits of 1873, thence through the business part of the city within said original limits, and extending eastward and northward to the railroad depot, and that said standpipe and all of said distributing mains and fire hydrants are within the limits of the city as now existing (composed of the original charter limits and the territory added in 1890), except that for a distance of about 900 yards one of said mains extends northward to said depot, with one fire hydrant thereon.

(28) It was shown, and the court so finds, that there has at all times been a well-defined business center in the city of Lampasas, which is within the limits of the charter of 1873; and the court also finds that between 1883 and 1890 a number of business houses and residences were established in the neighborhood of the railroad depot, all of which were within the limits of the charter of 1883, but are not within the limits over which the present city government assumes jurisdiction. Within this territory it was shown that there are 77 inhabited dwellings and 2 vacant dwellings. It was shown that of the persons occupying these dwelling houses 90 per cent. did business within the present limits of the city.

Franz Fiset, C. H. Miller, and J. C. Matthews, for plaintiff in error.

T. B. Cochran and R. G. West, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge (after stating the facts as above). The city of Lampasas was made a municipal corporation by special act of the legislature on April 18, 1873. Until 1876 the corporation remained organized under this special act. The city officers then resigned, and the administration of the town's affairs by officers was abandoned. In February, 1883, the population of the town having increased, an effort was made to form a new municipal corporation. The procedure was under statutes intended to apply to towns that had never been incorporated. The citizens of Lampasas were acting on the mistaken presumption that they had effectually abandoned and annulled the incorporation of the town under the special act. The town, as last organized, embraced substantially all of the territory covered by the special act, and also other lands so as to include a railroad depot. Each organization provided for the government of the town by a city council, and the usual officers were provided by each. The office of treasurer was not provided for by the special act. The last organization continued in practical force from February, 1883, to January 31, 1890, when the supreme court of Texas sustained quo warranto proceedings, and removed the city officers holding under an election had under the organization of 1883. The supreme court held that the effort to incorporate the town under the general laws was ineffectual, and that the mode adopted was only applicable to unincorporated towns. The effect of the court's opinion was to show that the special act of 1873 continued in force. Largen v. State, 76 Tex. 323, 13 S. W. 161. After the opinion of the supreme court was rendered, an election was held under the special charter of 1873, and soon thereafter the city regularly accepted the provisions of the general laws of the state relative to municipal corporations, as stated in the findings of the circuit court. By the charter of 1873 the mayor and aldermen were granted power to "construct waterworks" and to "issue bonds for public improvements." The bonds were issued, and used to secure the erection of the water works. The works are shown to be worth not less than from $25,-000 to $26,000, without estimating profits made by the contractor. The bonds were used to pay for the waterworks. In the absence of proof to the contrary, they are presumed to have passed into the possession of the plaintiff before maturity, for a valuable consideration, and without notice of any objection to which they were liable. City of San Antonio v. Mehaffy, 96 U. S. 314. If it be true that the corporation had authority under any circumstances to issue the securities, the bona fide holder has a right to presume they were legally issued. Id.

The dominant question in this case is, had the corporation, at the date of these bonds, the right to issue them? In one aspect a municipal corporation is an agency of the state government to perform certain functions. It is brought into existence by the state, and can only be annulled by the creative power, or pursuant to laws regularly made. Its existence cannot be collaterally attacked. As a party to a contract, it must be looked on as an individual, or as a private corporation, for its contracts are equally

under the protection of law. The prohibition against their impairment is as effective as in the case of the contracts of individuals. It is protected, even against execution, in the ownership of property necessary to the exercise of its public functions. It holds for taxation the real estate within its limits and the personal property of its residents. These are its resources for discharging its debts. The people living in it are the units of which the corporation is composed. The people and the property are the whole debt-paying elements of a municipal corporation. The organization is the mere shell that holds it in shape. The kernel is composed of the people and the property. Looking practically at the substance, rather than at the form, the courts have uniformly held that no change of name or of organization will enable a municipal corporation to avoid the payment of its debts. Whatever the name may be, whatever the officers may be called, the new organization would be the successor of the old, would be composed of the same, or nearly the same, units, would embrace the same territory, holding the same, or nearly the same, subjects of taxation, and would in fact be the successor of the first organization. As the second government succeeds to the rights of the first, it is also subject to its liabilities. Shapleigh v. City of San Angelo, 167 U. S. 646, 17 Sup. Ct. 957; Laird v. City of De Soto, 22 Fed. 422. In the case at bar the legal charter under the special act was laid aside. One illegal, but having all the appearances of legality, was formed. It named the necessary officers, elected them, and performed all the functions of a municipal corporation for a period of nearly seven years. The state, during this period, did not challenge its exercise of power. It issues $40,000 of bonds, and obtains the benefit of their sale. Then, by judgment of the court, the officers are removed as officers of the new organization, and others elected under the first charter. Can it be held that the city, composed of the same people, including the same resources for revenue, is now absolved of all liability upon the bonds? Can a city, under an illegal and irregular change of limits, preserving the same name, obtain credit for public improvements, and, when the irregular charter is vacated, return to the use of the first, which has all along been in force, and then stand freed of the debt? The people and property now sought to be charged were all, or nearly all, included and represented in the irregular corporation which issued the bonds. They get the benefit of the bonds. The facts show that the city and citizens were acting in good faith. The bonds were issued with public approval, and without objection. The improvements were accepted, and it was intended that the bonds should be paid. If it had been otherwise, if the irregular organization had been assumed in order to obtain credit, and abandoned to avoid payment, could such a scheme receive judicial sanction? This would not be permitted. It would open wide an avenue for fraud and imposition. If it is plain that such a plan, no matter how ingeniously executed, would not be permitted to succeed, it must be equally clear that, when the citizens and acting officers of the irregular corporation acted in good faith, and believed their

action to be regular and valid, such irregularity will not be permitted to work injustice. The officers representing the city in the issuance of the bonds believed that they were clothed with authority by the procedure of 1883. In this they were mistaken. The charter of 1873 was still in existence. It authorized the election of officers of the city. These officers had been elected. Although they believed that they held office under the new organization, they were officers de facto of the city, actually filling places created by the special act of 1873. The special act of incorporation authorized the issuance of the bonds for public improvement. An ordinance was passed to issue them. The bonds, we hold, were not made invalid by reason of the illegal effort at incorporation made in 1883.

There are other defenses suggested in argument, but it would serve no useful purpose to extend this opinion. The whole of the findings of fact by the circuit court will appear in the statement of the case, and it is sufficient to say that we concur in the conclusion of the learned judge presiding in the circuit court that the plaintiff was entitled to judgment. The judgment of the circuit court is affirmed.